# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| STEPHEN BUSHANSKY, Derivatively on Behalf of FIRST NBC BANK HOLDING COMPANY, | CASE NO. |
| Plaintiff, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT |
| vs. | JURY TRIAL DEMANDED |
| ASHTON J. RYAN, JR., SHIVAN GOVINDAN, JOSEPH F. TOOMY, WILLIAM D. AARON, JR., WILLIAM M. CARROUCHE, LEANDER J. FOLEY, III, JOHN F. FRENCH, LEON L. GIORGIO, JR., LAWRENCE B. JONES, LOUIS V. LAURICELLA, MARK G. MERLO, and DR. CHARLES S. TEAMER, SR., | |
| Defendants, | |
| and | |
| FIRST NBC BANK HOLDING COMPANY, a Louisiana Corporation, | |
| Nominal Defendant. | |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, respectfully submits this Verified Stockholder Derivative Complaint on behalf of nominal defendant First NBC Bank Holding Company ("First NBC" or the "Company") against certain of its directors and officers named herein (the "Individual Defendants," as defined below, and collectively with First NBC, the "Defendants").  Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based upon investigation by counsel.

## INTRODUCTION

1.      This is a stockholder derivative action brought on behalf of nominal defendant First NBC.  As set forth herein, the Individual Defendants were frequently put on notice and knew that First NBC had a material weakness in its internal controls over financial reporting, accounting practices, risk assessment, and its transaction level and review controls.  Indeed, they have admitted that there was a "lack of adequate oversight by the Company's Board of Directors" and "the Company's disclosure controls and procedures were not effective."  In breach of their fiduciary duties, the Individual Defendants ignored the material weakness and red flags and allowed them to persist and fester for years without taking action.  As a result of this glaring failure, and the failure to comply with the Company's Code of Business Conduct and Code of Ethics, the financial statements, press releases and earnings releases published by First NBC for the years 2011, 2012, 2013, 2014 and 2015 were materially false and misleading when made and required restatement.  The restatement, when disclosed in mid-2016, revealed that First NBC had consistently materially misstated its financial condition throughout its history as a public company, overstating its net income by as much as 38.1% in one quarterly period, and

that management's representations as to the effectiveness of internal controls over financial reporting should no longer be relied upon.

2.    The Company and its stockholders have been irreparably harmed by this misconduct.  The Securities and Exchange Commission (the "SEC") has opened an investigation into First NBC's financial reporting and accounting practices, aggrieved investors launched a securities fraud class action lawsuit against the Company and certain of its officers and directors, First NBC's credit rating has been downgraded, and the Company was deemed to be in "troubled condition" by, and subsequently became subject of a restrictive Consent Order with, its regulators.  Through this action Plaintiff seeks to recover, derivatively on behalf of the Company, the damages caused by the misconduct of the Individual Defendants.

3.    In November 2012, First NBC filed a draft Registration Statement (the "Draft Registration Statement") for its initial public offering of stock (the "IPO").  The Draft Registration Statement noted that First NBC had a material weakness regarding its internal controls over financial reporting, but assured the public that the Board of Directors (the "Board"), together with the Audit Committee, would act to ensure that the material weakness was swiftly fixed.

4.    Six months later, in May 2013, First NBC filed its final Registration Statement (the "Registration Statement") for its IPO.  In the Registration Statement, First NBC flagged the same material weakness in its internal controls disclosed in the Draft Registration Statement filed six months earlier and again assured the public that the Board, together with its Audit Committee, would take all necessary steps to remediate that material weakness.  It was also disclosed in the Registration Statement, that First NBC's internal controls were so weak that it had already been required to restate its pre-IPO financial statements for the years 2009, 2010,

and 2011 to correct errors in the accounting for certain of its investments in tax credit entities, *i.e.*, domestic corporations or partnerships that serve as intermediary vehicles for the provision of loans or investments in low-income communities or historic properties, of which the Company had $140.9 million worth as of December 31, 2012.

5.     Shortly after the IPO, in the Company's Quarterly Report on Form 10-Q for its second quarter ended June 30, 2013, First NBC unequivocally assured stockholders that its internal controls over financial reporting were effective and that it had taken appropriate actions to rectify its material weakness.

6.     Contrary to the assurances that the Individual Defendants caused First NBC to give the public, the existence of errors and irregularities in First NBC's post-IPO filings began to be publicly revealed in August 2015, when the Company disclosed that its Quarterly Report on Form 10-Q for its second quarter ended June 30, 2015 would not be timely filed with the SEC. The Company disclosed that the delay was caused by the identification of errors in the accounting for its investments in tax credit entities.  When the 10-Q was ultimately filed, the Individual Defendants caused First NBC to represent that the "errors" that delayed the filing were "immaterial."

7.     Further errors and irregularities in First NBC's post-IPO SEC filings came to light in the Company's Quarterly Report on Form 10-Q for its third quarter ended September 30, 2015, wherein First NBC disclosed that it again identified "errors" in its accounting for its investments in tax credit entities that the Individual Defendants wrote off as immaterial.

8.     On February 1, 2016, more issues regarding the Company's accounting emerged when it issued a press release disclosing disappointing financial results for its fourth quarter of 2015 and full year 2015.  Among the revelations in the press release was that the Company's

exposure to the oil and gas industry had ballooned to $158.4 million from the $108.0 million previously disclosed about five months earlier in its second quarter 10-Q, which would require the establishment of a substantial loan loss reserve, as well as the revelation of a %69 million investment in short term receivables due from a U.S. ethanol company, of which $39.7 million was past due at the time of the press release.

9.     A month later, in March 2016, First NBC again notified the public that it would be late making a required filing with the SEC.  The Company could not file its Annual Report on Form 10-K for fiscal 2015 because it had yet again identified "errors" in its accounting for investments in tax credit entities.  On April 8, 2016, First NBC disclosed that its consolidated financial statements for 2011 through 2014, as well as each of the interim periods within the years 2013-2015, need to be restated.  Shortly after this disclosure, a securities class action lawsuit was filed against First NBC, as well as Defendant Ryan and the Company's Chief Financial Officer ("CFO") Mary Verdigets ("Verdigets"), alleging violations of the federal securities laws.

10.     In August 2016, First NBC disclosed the full extent of its financial restatement -- the Company had consistently overstated its earnings.  The Company used an inappropriate amortization method for its investments in tax credit partnerships and recognition of additional impairments to investments in tax credit entities.  The use of these improper accounting methods was ascribed by the Company to material weaknesses relating to internal controls over financial reporting, just as with the restatement prior to the IPO.  Indeed, the very same lack of adequately trained personnel flagged as a material weakness almost four years earlier in the November 2012 Draft Registration Statement was highlighted as a cause for the need to restate.  First NBC

further ascribed the need to restate to Defendant Ryan's dominance and control over the Company's accounting function, and the Board's failure of oversight.

11.     First NBC subsequently disclosed that the SEC had initiated an investigation of the Company's financial reporting.  On October 25, 2016, the Company announced that the Federal Reserve Bank of Atlanta ("FRB") and Louisiana Office of Financial Institutions ("OFI") had declared the Company to be in "troubled condition," imposing certain restrictions on First NBC and its operations.  On November 17, 2016, First NBC disclosed that it entered into a Consent Order with the Federal Deposit Insurance Corporation (the "FDIC") and the OFI requiring it to devise, implement, and ensure adherence to certain plans, policies and procedures designed to improve the Company's troubled condition.  The Company further disclosed that it received a notice from Nasdaq threatening it with delisting due to its delay – yet again – in timely filing required documents with the SEC – this time, the Quarterly Report on Form 10-Q for the Company's third quarter ended September 30, 2016.

12.     The Individual Defendants have at all times owed First NBC and its stockholders the highest fiduciary duties.  These important fiduciary obligations were breached by the Individual Defendants.  The Individual Defendants knew that First NBC was operating without an effective system of internal controls over financial reporting, flouted their obligation to ensure that such a system was implemented and maintained, and failed to take steps necessary to remediate the Company's material weaknesses over the course of its history as a public company.

13.     Despite the magnitude and duration of the misconduct alleged herein, and the material harm caused to First NBC, the Individual Defendants have not taken any action to recover the Company's damages.  To the contrary, they have allowed Defendant Ryan and CFO

Verdigets, the Company's highest officers, to retain lucrative positions with First NBC and continue to reap their substantial salaries, bonuses, benefits and emoluments of office.

14.     Given the Individual Defendants' responsibility for the damage sustained by First NBC, they have a substantial likelihood of liability that renders a demand upon them a futile and wasteful act.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of the claims asserted herein pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District, where First NBC maintains its corporate headquarters.

## THE PARTIES

17.     Plaintiff Stephen Bushansky is a current shareholder of First NBC and has continuously owned First NBC stock since acquiring it in the IPO.  Plaintiff is a citizen of the State of New York.

18.     Nominal Defendant First NBC is a corporation duly organized and existing under the laws of the State of Louisiana.  First NBC maintains its headquarters at 210 Baronne St., New Orleans, Louisiana.  First NBC is a bank holding company that offers a broad range of financial services through its wholly-owned subsidiary, First NBC Bank, a Louisiana state-chartered bank.  The Company is one of the largest bank holding companies in the Gulf Coast region.

19.     Defendant Ashton J. Ryan, Jr. is the President, CEO and a member of the Board since 2006.  Ryan was also the Chairman of the Board until September 19, 2016.  Ryan is a citizen of the State of Louisiana.

20.     Defendant Shivan Govindan ("Govindan") is the Chairman of the Board since September 19, 2016, and has served as a director since 2006.  Govindan is also a member of the Audit Committee, Governance Committee and Nominating Committee of the Board.  Govindan is a citizen of the State of Colorado.

21.     Defendant Joseph F. Toomy ("Toomy") is the Lead Independent Director of the Board, and has served as a director since 2006.  Toomy is also the Chairperson of the Audit Committee, Governance Committee, and the Nominating Committees of the Board.  Toomy is a citizen of the State of Louisiana.

22.     Defendant William D. Aaron, Jr. ("Aaron") has served as a director since 2006.  Aaron is a citizen of the State of Louisiana.

23.     Defendant William M. Carrouche ("Carrouche") has served as a director since 2006.  Carrouche is also a member of the Governance Committee, Compensation Committee and Nominating Committee of the Board.  Carrouche is a citizen of the State of Louisiana.

24.     Defendant Leander J. Foley, III ("Foley") has served as a director since 2010.  Foley is also a member of the Audit Committee of the Board.  Foley is a citizen of the State of Maryland.

25.     Defendant John F. French ("French") has served as a director since 2006.  French is also a member of the Governance Committee, Compensation Committee, and Nominating Committee of the Board.  French is a citizen of the State of Louisiana.

26.     Defendant Leon L. Giorgio, Jr. ("Giorgio") is the Vice Chairman of the Board and has served as a director since 2006.  Giorgio is also Chairperson of the Compensation Committee, and is a member of the Governance Committee, and Nominating Committee of the Board.  Giorgio is a citizen of the State of Louisiana.

27.     Defendant Lawrence B. Jones ("Jones") has served as a director since 2006. Jones is also a member of the Audit Committee, Governance Committee, and Nominating Committee of the Board.  Jones is a citizen of the State of Louisiana.

28.     Defendant Louis V. Lauricella ("Lauricella") has served as a director since 2007. Lauricella is also a member of the Governance Committee and Nominating Committee of the Board.  Lauricella is a citizen of the State of Louisiana.

29.     Defendant Mark G. Merlo ("Merlo") has served as a director since 2011.  Merlo is also a member of the Governance Committee and Nominating Committee of the Board.  Merlo is a citizen of the State of California.

30.     Defendant Dr. Charles C. Teamer, Sr. ("Teamer") has served as the Vice Chairman of the Board since 2010 and has served as a director since 2009.  Teamer is a citizen of the State of Louisiana.

## THE INDIVIDUAL DEFENDANTS' DUTIES

31.     By reason of their position as officers, directors, and/or fiduciaries of First NBC and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed First NBC and its stockholders fiduciary obligations of care, good faith, loyalty, and diligence.  The Individual Defendants were and are required to use their utmost ability to control and manage First NBC in a fair, just, honest, and equitable manner; act in furtherance of the best interests of First NBC and its stockholders; ensure that the Company

implemented and maintained an effective system of internal controls over its financial reporting; and ensure that effective corporate governance practices and procedures were in place.

32. The Individual Defendants, because of their positions of control and authority as directors and/or officers of First NBC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with First NBC, each of the Individual Defendants had knowledge of material, non-public information regarding the Company.

33. To discharge their duties, the officers and directors of First NBC were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of First NBC were and are required, among other things, to:

a. Provide full, fair, accurate, timely, and understandable disclosure in all reports and documents that First NBC files with, or submits to, the SEC and all other regulatory authorities, and in all other public communications made by First NBC;

b. Ensure that every financial record is accurate, timely and in accordance with law, and that all reports made to regulatory authorities be fair, accurate, complete, timely and understandable; and

c. Report violations, and suspected violations, of applicable laws, rules, regulations or the Code to the Chief Executive Officer or the Chief Compliance Officer or the Board.

34. The Individual Defendants were and are subject to First NBC's Code of Business Conduct (the "Code of Conduct"), which requires "honest and ethical conduct" from the Company's directors, officers and employees. Pursuant to the Code of Conduct, all First NBC directors, officers and employees are "required to comply with all applicable governmental laws, rules and regulations, as well as this Code of Business Conduct, in letter or spirit."

35.     The Code of Conduct sets out with regard to public disclosures:

It is First NBC's policy to provide full, fair, accurate, timely and understandable disclosure in all reports and documents that it files with, or submits to, the Securities and Exchange Commission and all other regulatory authorities, and in all other public communications made by First NBC.

36.     The Code of Conduct sets out financial reporting responsibilities:

Every financial record must be accurate, timely and in accordance with law. These records are the basis for managing First NBC's business and for fulfilling its obligations to its shareholders, employees, customers, suppliers and regulatory authorities.   Accordingly, employees should always record and classify transactions in the proper accounting period and in the proper amount and department.  All transactions must be supported by accurate documentation.  All reports made to regulatory authorities must be fair, accurate, complete, timely and understandable.  Depending on their position with First NBC, employees may be called upon to provide information to assure that First NBC's public reports comply with this paragraph or to cooperate with investigations into the accuracy and timeliness of financial records.  We expect all of First NBC's personnel to take this responsibility very seriously and to provide prompt and accurate answers to inquiries related to its public disclosure requirements.

37.     The Code of Conduct requires that directors and officers use their "best efforts to ensure that employees understand and comply with this Code" and sets out the penalties for those who violate it:  "Violation of any of the standards contained in this Code, or in any other policy, practice or instruction of First NBC, can result in disciplinary actions, including dismissal and civil or criminal action against the violator."

38.     First NBC also maintains written Corporate Governance Guidelines (the "Governance Guidelines").  The Governance Guidelines set out the role of the Company's Board and management:

The business of First NBC is conducted by its employees and officers, under the direction of the Chief Executive Officer and the oversight of the Board, to enhance the long-term value of First NBC for its shareholders.  The Board acts as the ultimate decision-making body of First NBC, except with respect to those matters reserved to or shared with the shareholders of First NBC under its articles of incorporation or the laws of the State of Louisiana.

39.     The Governance Guidelines set out the obligation to comply with the Code of

Conduct:

> First NBC has adopted a Code of Business Conduct, which sets forth First NBC's commitment to integrity and ethical behavior in all aspects of its business activity. The Code is applicable to all directors, officers and employees of First NBC and its subsidiaries.   The Code addresses several areas, including compliance with law, conflicts of interest, confidentiality of information, protection and proper use of corporate assets and the reporting of any illegal or unethical behavior.  Each director, officer and employee is expected to be familiar with and follow the Code.  First NBC has also adopted a Code of Ethics for Chief Executive Officer and Senior Financial Officers, which applies to First NBC's Chief Executive Officer, Chief Financial Officer and any other senior officer, if any, serving in a financial function with First NBC.

40.     A Code of Ethics for the Chief Executive Officer and Senior Financial Officers

(the "Code of Ethics") was adopted by the Board "to promote honest and ethical conduct, proper

disclosure of financial information in First NBC's public filings and disclosures and compliance

with applicable laws, rules and regulations by the senior officers of First NBC who have

financial responsibilities."  The Code of Ethics requires, among other things:

> In the performance of his or her duties, each Covered Officer must, to the best of his or her knowledge and ability:
>
> 1.     Engage in and promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships that may affect First NBC or any of its subsidiaries;
>
> 2.     Take all reasonable measures designed to protect the confidentiality of non-public information about First NBC and its subsidiaries and their respective customers obtained or created in connection with employment with First NBC and to prevent the unauthorized disclosure of such information unless required by applicable law or regulation or legal or regulatory process;
>
> 3.     Perform responsibilities with a view to causing periodic reports and other documents filed with the Securities and Exchange Commission ("SEC"), and other public communications made by First NBC, to contain information that is accurate, complete, fair and understandable;
>
> 4.     Take all reasonable measures designed to ensure material compliance with applicable laws and regulations of federal, state, and local governments, as well as

the rules and regulations of other appropriate private and public regulatory agencies;

5.      Promptly bring to the attention of the Audit Committee any information he or she may have concerning (a) significant deficiencies or material weaknesses in the design or operation of internal controls that could adversely affect First NBC's ability to record, process, summarize and report financial data, or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in First NBC's financial and regulatory reporting, disclosures or internal controls;

6.      Avoid those situations where personal or financial interests or relationships might actually influence such officer's judgment on matters affecting First NBC;

7.      Promptly bring to the attention of the Audit Committee any information he or she may have concerning evidence of a material violation of banking, securities or other laws, rules or regulations applicable to First NBC or its subsidiaries or of the Code of Business Conduct or this Code of Ethics;

8.      Use corporate assets and resources employed or entrusted in a responsible manner; and

9.      Advance First NBC's legitimate interests when the opportunity arises.

The Audit Committee will have the power to monitor, make determinations and recommend action to the Board with respect to violations of this Code of Ethics. Such actions will be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code of Ethics. In determining what action is appropriate in a particular case, the Board and/or the Audit Committee will take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

## ADDITIONAL DUTIES OF THE AUDIT COMMITTEE

41.     Pursuant to the Audit and Risk Committee Charter, the members of the Audit

Committee had the responsibility, among other things, to:

a.      Oversee the Company's financial reporting process on behalf of the Board and to make regular reports to the Board of its activities;

b.    Review and discuss with management and the independent auditors significant accounting and reporting issues, including complex or unusual transactions and highly judgmental areas;

c.    Review and discuss with management and the independent auditors earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

d.    Review and discuss with management and the independent auditors critical accounting policies and financial statement presentations, including significant changes in the Company's selection or application of accounting policies, and the effect of new accounting initiatives on the financial statements;

e.    Be responsible for the appointment, subject to the shareholders' approval, and termination, compensation, and oversight of the work of the independent auditors, including resolution of disagreements between management and the auditors regarding financial reporting;

f.    Identify areas of risk and develop an annual audit plan to test and evaluate controls in those areas, and review and approve the scopes of all internal audits set by the Manager of Internal Audit or by the contracted audit service provider; and

g.    Regularly report to the Board about Committee activities, issues, and related recommendations, including any control deficiencies or other matters having actual or potential effect on the fair presentation of financial results.

## ADDITIONAL DUTIES OF THE GOVERNANCE COMMITTEE

42.    Pursuant to the Nominating and Governance Committee Charter, the members of

the Governance Committee had the responsibility, among other things, to:

a.    Develop and review periodically, and at least annually, the Corporate Governance Guidelines adopted by the Board to ensure that they are appropriate for First NBC and comply with applicable laws, regulations and Nasdaq listing requirements and recommend any desirable changes to the Board;

b.    Consider, develop and recommend to the Board such policies and procedures with respect to corporate governance matters as may be required or required to be disclosed in accordance with applicable laws, regulations or Nasdaq listing requirements or otherwise considered to be desirable and appropriate in the discretion of the Committee;

c.      Review and assess the adequacy of the codes of business conduct and/or ethics applicable to First NBC's directors, officers and employees, and recommend any desirable changes to the Board; and

d.      Consider any other corporate governance issues that arise from time to time, review shareholder proposals related to corporate governance and develop appropriate recommendations for the Board.

## **ADDITIONAL DUTIES OF THE COMPENSATION COMMITTEE**

43.      Pursuant to the Compensation Committee Charter, the members of the

Compensation Committee had the responsibility, among other things, to:

a.      Oversee and evaluate overall human resources and compensation structure, policies and programs, and assess whether these establish appropriate incentives and leadership development opportunities for management and other employees;

b.      Develop corporate goals and objectives relevant to the compensation of the Chief Executive Officer and evaluate annually the performance of the Chief Executive Officer in light of those goals and objectives.  Based on this evaluation, the Committee will determine and approve the compensation level of the Chief Executive Officer, including salary, bonus, stock options, other stock incentive awards and/or long-term cash incentive awards;

c.      Review and approve on an annual basis the evaluation process and compensation structure for First NBC's other executive officers.  In addition, the Committee, in its discretion, may review and act upon management proposals to designate incentive-based compensation awards to any employee;

d.      Review, approve and administer the Bank's compensation, incentive compensation and equity-based plans and recommend changes in such plans to the Board as needed.  The Committee will monitor the effectiveness of non-equity based benefit plan offerings, in particular benefit plan offerings and perquisites, and approve any material new employee benefit plan or change to an existing plan that creates a material financial commitment by First NBC.  In its discretion, the Committee may otherwise approve, amend, modify, ratify or interpret the terms of, or terminate, any non-equity based benefit plan or delegate such authority to the extent set forth herein;

e.      Review, approve and make recommendations to the Board with respect to all employment agreements, severance or termination agreements, change in control agreements or similar agreements proposed to be entered into between any senior executive officer and First NBC; and

f.      Review director compensation levels and practices, and recommend, from time to time, changes in such compensation levels and practices to the Board.

## SUBSTANTIVE ALLEGATIONS

### *First NBC's investments in tax credit entities*

44.     First NBC makes substantial investments in tax credit entities under the New Markets Tax Credit, Federal Historic Rehabilitation Tax Credit, and Low Income Housing Tax Credit programs.  As described in First NBC's 2014 Annual Report, such tax credit entities typically consist of a limited liability company that owns or master leases real estate.  The Company receives a 99.99% (for Low-Income Housing) and a 99% (for Federal Historic Rehabilitation) non-voting interest in the entity that must be retained during the compliance period for the credits (15 years for Low-Income Housing credits and five years for Federal Historic Rehabilitation credits).  In most cases, the interest in the entity is reduced from a 99.99% or 99% interest to a 5% to 25% interest at the end of the compliance period.  First NBC accounted for its investments in tax credit entities by amortizing the investment over the estimated holding or contract period.

45.     First NBC invests in these tax credit entities through direct or indirect subsidiaries, and financial returns are generated through the receipt of federal and/or state tax credits.

### *First NBC's investments in short-term receivables*

46.     First NBC made significant investments in short-term receivables which are traded over the Receivables Exchange, a New York Stock Exchange listed electronic exchange for the sale and purchase of accounts receivable of companies whose annual revenues exceed $1 billion, and whose common equity is listed on a national securities exchange, or whose debt is rated by Standard & Poor's or Moody's.  Und ether terms of the exchange contracts; the seller of

15

the receivables is contractually committed to repurchase the receivable back from the purchase if payment is not made by a specified repurchase date, subject to certain exceptions.  First NBC accounted for its investments in short-term receivables by recording them on its consolidated balance sheets at cost plus accreted discount.  The Company also evaluates these investments for impairment once they become delinquent.

### *First NBC goes public*

47.     On November 9, 2012, First NBC filed a Draft Registration Statement with the SEC, in preparation for its IPO.  In the Draft Registration Statement, First NBC reported that in 2012 it had been required to restate its previously issued 2009, 2010, and 2011 audited financial statements (the "2012 Restatement"):

> After the issuance of our audited financial statements on April 30, 2012 for the year ended December 31, 2011, we decided to restate our previously issued 2011, 2010, and 2009 audited financial statements to properly reflect in the appropriate periods an amount related to our deferred income taxes that was originally recorded and presented as part of our 2011 results of operations.  Since we decided to restate, we also recorded our final fair value adjustments associated with the Central Progressive Bank acquisition, other identified but previously unrecorded errors that were known when we issued our 2011 consolidated financial statements, and other amounts that we identified after April 30, 2012 while preparing our 2011 income tax return.  The cumulative effect of recording all of these adjustments is not material to our previously reported 2010 or 2011 net income.  Our 2009 net income was reduced 23.2%, compared to amounts previously reported.

48.     First NBC claimed to have taken steps to remediate the internal control weaknesses that led to the 2012 Restatement, but placed the responsibility for assessing the effectiveness of those efforts on the Board, in coordination with the Audit Committee:

> As part of the restatement of our audited financial statements, we identified a material weakness in our internal control related to the accounting for the deferred taxes associated with certain of our tax credit investments.  The material weakness in our internal control was the lack of a sufficient number of accounting employees with the appropriate technical skills and knowledge regarding tax credit investments.  We have taken what we believe are the appropriate actions to

address the weakness, including hiring additional accounting personnel with expertise in tax credits, using outside accountants and consultants to supplement our internal staff when necessary, and implementing additional internal control procedures. **Our board of directors, in coordination with our audit committee, will continually assess the progress and sufficiency of these initiatives and make adjustments, as necessary**. (Emphasis added).

49.     On May 7, 2013, the final Registration Statement (the "Registration Statement"), signed by the Individual Defendants and CFO Verdigets, was filed with the SEC.

50.     On May 10, 2013, the Company filed its Final Prospectus with the SEC.  In the Final Prospectus, First NBC reiterated the information regarding the 2012 Restatement provided in the Draft Registration Statement.  First NBC also reiterated its description of its purported remediation of the control weakness and that determining the effectiveness of those efforts would be the province of the Board, in coordination with the Audit Committee:  "[o]ur board of directors, in coordination with our audit committee, will continually assess the progress and sufficiency of these initiatives and make adjustments, as necessary."

51.     First NBC reported that its financial statements had been "prepared in accordance with accounting principles generally accepted in the United States and with general practices within the financial services industry" and that the Company was "implementing management assessment and testing of internal controls consistent with the Sarbanes-Oxley Act."

52.     On June 24, 2013, First NBC filed with the SEC its Quarterly Report on Form 10-Q for its first quarter ended March 31, 2013 (the "1Q13 10-Q").  The 1Q13 10-Q was signed by Defendant Ryan and CFO Verdigets.  First NBC reported net income of $8.3 million and investments in tax credit entities of $66.7 million.  The 1Q13 10-Q also attached certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Ryan and CFO Verdigets.  Ryan attested:

I, Ashton J. Ryan, Jr., President and Chief Executive Officer of First NBC Bank Holding Company, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of First NBC Bank Holding Company;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of the annual report) that has materially affected, or is reasonably likely

to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

53.   Defendant Ryan further certified:

In connection with the Quarterly Report of First NBC Bank Holding Company (the "Company") on Form 10-Q for the period ended June 30, 2013 (the "Report"), I, Ashton J. Ryan, Jr., President and Chief Executive Officer of the Company, certify that:

   (1) The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

   (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the periods covered in the Report.

54.   CFO Verdigets swore out substantially similar certifications.

55.   On August 14, 2013, First NBC filed with the SEC its Quarterly Report on Form 10-Q with the SEC for its second quarter ended June 30, 2013, which was signed by Defendant Ryan and CFO Verdigets (the "2Q13 10-Q"). First NBC reported net income of $8.6 million, and investments in tax credit entities of $79.3 million. The 2Q13 10-Q attached SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar attestations as those in the SOX certifications attached to the 1Q13 10-Q. With regard to the Company's internal controls, the 2Q13 10-Q cautioned:

During 2012, we identified a material weakness in our internal control that related to the accounting for the deferred tax aspects of certain of our investments in the entities that generate tax credits. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness in our internal control was the lack of a sufficient number of accounting employees with the appropriate technical skills and knowledge regarding tax credit investments. We have taken what we believe are the appropriate actions to address the weakness including, hiring additional accounting personnel, providing training to our personnel to develop the expertise in tax credits, using outside accountants and consultants to supplement our internal staff when necessary, and implementing additional internal control procedures. We will continue to periodically test and update, as necessary, our internal control systems, including our financial reporting controls. However, our actions may not be sufficient to result in an effective internal control environment.

If our actions are insufficient to fully correct the internal control weakness that we have identified, if we identify other material weaknesses in our internal control over financial reporting in the future, if we cannot comply with the requirements of the Sarbanes-Oxley Act in a timely manner or attest that our internal control over financial reporting is effective, or if our independent registered public accounting firm cannot express an opinion as to the effectiveness of our internal control over financial reporting when required, we may not be able to report our financial results accurately and timely. As a result, investors, counterparties and customers may lose confidence in the accuracy and completeness of our financial reports; our liquidity, access to capital markets, and perceptions of our creditworthiness could be adversely affected; and the market price of our common stock could decline. In addition, we could become subject to investigations by the stock exchange on which our securities are listed, the Securities and Exchange Commission, the Federal Reserve or the FDIC, or other regulatory authorities, which could require additional financial and management resources. These events could have a material adverse effect on our business, financial condition, results of operations and prospects.

56.     Despite the risk set out in the 2Q13 10-Q, the Individual Defendants caused First

NBC to assure shareholders that the Company's internal controls over financial reporting were

effective:

An evaluation of the effectiveness of the Company's disclosure controls and procedures as of June 30, 2013 was carried out under the supervision, and with the participation of, the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"). Based on that evaluation, the CEO and CFO have concluded that the Company's disclosure controls and procedures are effective in alerting

them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934 (the "Exchange Act").

57.     On November 14, 2013, First NBC filed with the SEC its Quarterly Report on

Form 10-Q for its third quarter ended September 30, 2013, which was signed by Defendant Ryan

and CFO Verdigets (the "3Q13 10-Q").  First NBC reported net income of $10.5 million, and

investments in tax credit entities of $85.9 million.  The 3Q13 10-Q assured stockholders that

Defendant Ryan and CFO Verdigets conducted an evaluation of the effectiveness of the

Company's disclosure controls and procedures and, based on that evaluation, "concluded that the

Company's disclosure controls and procedures are effective in alerting them in a timely manner

to material information required to be disclosed by the Company in reports that it files or submits

under the Securities Exchange Act of 1934."  The 3Q13 10-Q attached SOX certifications by

Defendant Ryan and CFO Verdigets making substantially similar attestations as those in the

SOX certifications attached to the 1Q13 10-Q.

58.     On March 31, 2014, First NBC filed with the SEC its Annual Report on Form 10-

K for its fiscal year ended December 31, 2013 (the "FY13 10-K"), which was signed by

Defendant Ryan and CFO Verdigets.  First NBC reported net income of $40.9 million, and

investments in tax credit entities of $117.7 million for the fiscal year.  The FY13 10-K attached

SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar

attestations as those in the SOX certifications attached to the 1Q13 10-Q.  With regard to internal

controls, the Company reiterated its assurance in the 2Q13 10-Q that the material weaknesses in

internal controls related to accounting for the deferred tax aspects of certain investments in

entities generating tax credits had been cured, as well as the caution in the 2Q13 10-Q as to the

dire ramifications to the Company if those internal weaknesses in financial reporting were not cured.

59.     On May 15, 2014, First NBC filed with the SEC its Quarterly Report on Form 10-Q for its first quarter ended March 31, 2014 (the "1Q14 10-Q"), which was signed and by Defendant Ryan and CFO Verdigets.  First NBC reported net income of $12.8 million, and investments in tax credit entities of $121.4 million.  The 1Q14 10-Q assured shareholders that Defendant Ryan and CFO Verdigets conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, "concluded that the Company's disclosure controls and procedures are effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934."  The 1Q14 10-Q attached SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar attestations as those made in the SOX certifications attached to the 1Q13 10-Q.

60.     On August 14, 2014, First NBC filed with the SEC its Quarterly Report on Form 10-Q for its second quarter ended June 30, 2014 (the "2Q14 10-Q"), which was signed by Defendant Ryan and CFO Verdigets.  First NBC reported net income of $12.7 million, and investments in tax credit entities of $111.9 million.  The 2Q14 10-Q assured shareholders that Defendant Ryan and CFO Verdigets conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, "concluded that the Company's disclosure controls and procedures are effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934."  The 2Q14 10-Q attached SOX certifications by

Defendant Ryan and CFO Verdigets making substantially similar attestations as those made in the SOX certifications attached to the 1Q13 10-Q.

61.     On November 12, 2014, First NBC filed with the SEC its Quarterly Report on Form 10-Q for its third quarter ended September 30, 2014 (the "3Q14 10-Q"), which was signed by Defendant Ryan and CFO Verdigets.  First NBC reported net income of $14.4 million, and investments in tax credit entities of $118.2 million.  The 3Q14 10-Q assured shareholders that Defendant Ryan and CFO Verdigets conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, "concluded that the Company's disclosure controls and procedures are effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934."  The 3Q14 10-Q attached SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar attestations as those in the SOX certifications attached to the 1Q13 10-Q.

62.     On March 31, 2015, First NBC filed with the SEC its Annual Report on Form 10-K with the SEC, for the fiscal year ended December 31, 2014 (the "FY14 10-K"), which was signed by Defendant Ryan and CFO Verdigets.  First NBC reported net income of $55.6 million, and investments in tax credit entities of $140.9 million.  The FY14 10-K attached SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar attestations as those made in the SOX certifications attached to the 1Q13 10-Q.  With regard to internal controls, the FY14 10-K reiterated the assurance that the material weaknesses in internal control related to accounting for the deferred tax aspects of certain investments in entities generating tax credits had been cured, as well as the caution in the 2Q13 10-Q as to the dire ramifications to the Company if those internal weakness in financial reporting were not cured.

63.     Despite the risk warnings, the Individual Defendants caused First NBC to assert that the Company's internal controls over financial reporting were effective:

> The Company's internal control over financial reporting is a process designed under the supervision of its Chief Executive Officer and Chief Financial Officer to provide reasonable assurance regarding the reliability of financial reporting and the preparation of our financial statements for external purposes in accordance with generally accepted accounting principles.
>
> As of December 31, 2014, management assessed the effectiveness of the Company's internal control over financial reporting based on the criteria for effective internal control over financial reporting established in "Internal Control-Integrated Framework (2013)," issued by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission.  Based on the assessment, management determined that the Company maintained effective internal control over financial reporting as of December 31, 2014.

64.     On May 8, 2015, First NBC filed with the SEC its Quarterly Report on Form 10-Q for its first quarter ended March 31, 2015 (the "1Q15 10-Q"), which was signed by Defendant Ryan and CFO Verdigets.  First NBC reported net income of $17 million, and investments in tax credit entities of $147.1 million.  The 1Q15 10-Q assured shareholders that Defendant Ryan and CFO Verdigets conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, "concluded that the Company's disclosure controls and procedures are effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934."  The 1Q15 10-Q attached SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar attestations as those in the SOX certifications attached to the 1Q13 10-Q.

65.     On August 11, 2015, First NBC filed with the SEC a Notification of Late Filing on Form 12b-25 regarding the filing of its Quarterly Report on Form 10-Q for its second quarter ended June 30, 2015.  The Late Filing Notice explained why the 10-Q could not be timely filed:

In connection with the preparation of its Form 10-Q for the quarter ended June 30, 2015, the registrant identified errors in its accounting for certain of its investments in tax credit entities.  As a result of the time needed by the registrant to evaluate the impact of the errors in its accounting for certain of its investments in tax credit entities, and for the registrant and its auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's evaluation of internal control over financial reporting, the registrant requires additional time to complete and file its Form 10-Q.  The registrant expects to file its Form 10-Q within the extended time period prescribed under Exchange Act Rule 12b-25.

66.     On August 17, 2015, First NBC filed with the SEC its Quarterly Report on Form 10-Q for its second quarter ended June 30, 2015 (the "2Q15 10-Q").  The 2Q15 10-Q was signed by Defendant Ryan and CFO Verdigets.  First NBC reported net income of $17.2 million, and investments in tax credit entities of $174.3 million.  The 2Q15 10-Q assured shareholders that Defendant Ryan and CFO Verdigets conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, "concluded that the Company's disclosure controls and procedures are effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934."  The 2Q15 10-Q attached SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar attestations as those in the SOX certifications attached to the 1Q13 10-Q.

67.     In the 2Q15 10-Q, the Individual Defendants caused First NBC to report that the filing of the 2Q15 10-Q had been delayed due to the identification of "errors" in the financial statements relating to the accounting for its investments in tax credit entities, though such "errors" were purportedly "immaterial":

The Company identified errors in the accounting for its investments in certain tax credit entities during its quarterly financial statement close process.  The errors were corrected in the Company's consolidated financial statements as of June 30, 2015 and for the three months then ended.  The errors did not have a material impact to the consolidated financial statements for any prior periods as previously

reported and were not material to the anticipated annual results for the year ended December 31, 2015.

The Company has historically accounted for the investments in tax credits entities using an amortized cost method over the related tax credit compliance period. The Company determined that based on its equity ownership structure in certain of these investments the equity method of accounting should have been applied. Under the equity method of accounting, the Company records its share of earnings (losses) as a component of noninterest expense and evaluates its investments in tax credit entities for impairment at the end of each reporting period.  During the review of certain of its investments in tax credit entities, the Company also identified a single investment in a tax credit entity, determined to be a variable interest entity (VIE) that was not consolidated as required.  The Company was deemed to have a controlling financial interest in the VIE because it had both the power to direct the activities of the VIE that most significantly impact the VIE's economic performance and the obligation to absorb losses of the entity or the right to receive benefits from the entity that could potentially be significant to the VIE.

The Company utilized the guidance provided in Accounting Standards Codification (ASC) Topic 250 as well as SEC Staff Accounting Bulletins (SAB) No. 99 and No. 108.  The guidance required the Company to evaluate and assess the materiality of these errors both qualitatively and quantitatively, and the Company concluded that these errors did not materially misstate previously issued financial statements for any prior periods.   As a result, amendment of the Company's previously filed Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K are not required.

68.     First NBC reported in the 2Q15 10-Q that the impact of the errors corrected for the three month period ended June 30, 2015, net of tax, was a net loss of $718,000, which consisted of a $49,000 loss attributable to errors in impairment of the Company's investments in tax credit entities, and a $669,000 loss attributable to the consolidation of the Low-Income Housing Investment VIE.

69.     First NBC also reported in the 2Q15 10-Q that the impact of the errors corrected for the six month period ended June 30, 2015, net of tax, was a net loss of $765,000, which consisted of a $3,000 gain from errors in impairment of the Company's investments in tax credit

entities, and a loss of $768,000 attributable to the consolidation of the Low-Income Housing Investment VIE.

70.     On November 9, 2015, First NBC filed with the SEC its Quarterly Report on Form 10-Q for its third quarter ended September 30, 2015 (the "3Q15 10-Q"), which was signed by Defendant Ryan and CFO Verdigets.  First NBC reported net income of $18.2 million, and investments in tax credit entities of $172.3 million.  The 3Q15 10-Q assured shareholders that Defendant Ryan and CFO Verdigets conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures and, based on that evaluation, "concluded that the Company's disclosure controls and procedures are effective in alerting them in a timely manner to material information required to be disclosed by the Company in reports that it files or submits under the Securities Exchange Act of 1934."  The 3Q15 10-Q attached SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar attestations as those in the SOX certifications attached to the 1Q13 10-Q.

71.     The 3Q15 10-Q disclosed that more "errors," which the Individual Defendants characterized as "immaterial," had been discovered in the Company's accounting for tax credit entities:  "During the third quarter of 2015, the Company identified additional out of period errors related to the correction of immaterial errors associated with its investment in tax credit entities.  The Company, in performing its impairment testing on its investment in tax credit entities as of September 30, 2015 identified errors in the calculation of impairment amounts recorded for its Low-Income Housing, Federal New Markets and State Historic Rehabilitation tax credit projects.  The Company also identified additional depreciation and interest expense on the Low-Income Housing investment VIE in the prior period."

72.     The errors identified in the 3Q15 10-Q also included a net income loss, net of tax, of $129,000 for the three month period ended September 30, 2015 attributable to Federal and State Historic Rehabilitation, and a net income gain of $233,000 for the nine month period ended September 30, 2015.  These errors also included a total investment in tax credit entities impairment gain of $1.6 million for the three month period ended September 30, 2015, and $2.2 million gain for the nine month period ended September 30, 2015.

73.     On February 1, 2016, First NBC issued a press release disclosing its fourth quarter of 2015 and full year 2015 financial results.  The Company reported net income of $15.8 million for the fourth quarter and net income of $67.3 million for full year 2015.  The reported earnings significantly underperformed what the Individual Defendants had led the investment community to expect, based, in large part, on an $8.2 million tax credit impairment the Company disclosed it had been forced to take.

74.     In the February 1, 2016 press release, First NBC disclosed that its direct exposure to the oil and gas industry had substantially increased from September 30, 2015 to December 31, 2015.  The bank's energy loan exposure was now $158.4 million, or 4.5% of its total loans. This was a significant increase from prior filings.  In the 2Q15 10-Q, the Company's oil and gas commercial loan portfolio was reported as $108.0 million, or 3.6% of its total loans.  The Company also had exposure to exploration and production in the oil and gas portfolio of $61.2 million with outstanding commitments of $3.0 million.  The Individual Defendants did not clarify in the press release whether adequate reserves had been taken against the Company's oil and gas exposure.

75.     In the February 1, 2016 press release, First NBC also disclosed that it had decreased its investments in short-term receivables from $182.9 million, reported in the 3Q15

10-Q, and $237.1 million, reported in the FY14 10-K, to $95.5 million..  The Company attributed

this to a "strategic decision to increase its liquidity and capital position."  The Company also

disclosed that the $95.5 million in short-term receivables investments it held included $69

million due from an unidentified U.S. ethanol company, and that $39.7 million of that balance

was past due.  The Company assured investors that "based on its analysis of the financial

capabilities of the obligor and the receivables seller and after consultation with independent

counsel, management does not expect that the Company will incur any loss on its investment

[sic] in its investment in short-term receivables related to the past due receivables."

76.     On February 11, 2016, due to the significant amount of inquiries it received after

disseminating the February 1, 2016 press release, First NBC filed with the SEC a Current Report

on Form 8-K providing a Supplemental Information Sheet regarding the disclosures.  First NBC

explained in the Supplemental Information Sheet that it had not taken reserves against its

exposure to the oil and gas industry in the past, and that it would now be taking an $11 million

reserve against that exposure, stating in pertinent part as follows:

> **2) *Why didn't the Company disclose the amount of its loan loss reserve
> allocated to oil and gas credit exposure?***
>
> The Company has never disclosed the amount of its reserves allocated to
> any particular industry.  After a review of the year-end disclosures of
> banks with significant oil and gas exposure, ***the Company has determined
> that such a disclosure may be valuable and will do so in the Company's
> 2015 Form 10-K.***  As of December 31, 2015, the Company had no loans
> to its direct or indirect oil and gas customers which were classified as
> impaired ***and thus had no specific reserves related to its oil and gas
> industry loans.***  However, ***in view of the substantial decline in oil prices,
> the Company has taken into account the exposure to the risk of loss in
> its portfolio within its ALLL methodology[1] due to the oil and gas price
> decline and has allocated $11 million as of December 31, 2015***.

---

[1] ALLL Methodology is a bank's "Allowance for Loan and Lease Losses."  According to the
Board of Governors of the Federal Reserve, the purpose of the ALLL is to reflect estimated

77.     The Supplemental Information Sheet also provided additional detail into the

issues First NBC had relating to its investments in short-term receivables, stating in pertinent

part as follows:

> The receivables from the ethanol company were purchased through— The
> Receivables Exchange, a national exchange established to allow vendors to sell
> their customers' receivables to third party investors.  Under the terms of the
> exchange contracts, the seller of the receivable is contractually committed to
> repurchase the receivable back from the seller if payment is not made by a
> specified repurchase date, subject to certain exceptions.  Thus, the Company, as
> receivable purchaser, has two potential sources of repayment, the original issuer
> of the receivables (the ethanol company) or the seller and can choose to pursue
> either or both.
>
> The failure of the ethanol company to pay the invoices when due was the result of
> the financial difficulties of its parent, a Spanish "green" energy company with
> worldwide operations focused on expanding the use of solar power.  This crisis
> caused U.S. suppliers of grain to the ethanol plants owned by the U.S. subsidiaries
> of the Spanish company to freeze credit to the ethanol plants for corn purchases,
> resulting in a shutdown 4 of the 6 ethanol plants owned by the U.S. subsidiaries of
> the Spanish company.  Based on the Company's assessment of the strength of the
> ethanol industry and the historical earnings performance of the ethanol company
> and the receivables seller, the Company believes that both the ethanol company
> and the receivables seller are capable of repaying the full amount of the receivable
> balance over time.  In addition, the parent corporation of the ethanol company is
> evaluating certain restructuring options that would permit a more prompt
> repayment of the receivable.  As a result of the foregoing, management does not
> expect that the Company will incur any loss on its investment in short-term
> receivables related to the past due receivables discussed above.  Finally, the
> receivable issued by the ethanol company represents 95% of the currently
> outstanding balance in the Company's investment in short term receivables.

78.     The Supplemental Information Sheet also provided additional detail into the

issues First NBC had been having with its accounting in regard to tax credits and the negative

impact it had on the Company's net income, stating in pertinent part as follows:

> **4)      The fourth quarter net income of $15.7 million is less than the $18.1
>        million reported for the linked third quarter.  *What caused this and is***

---

credit losses within a bank's portfolio of loans and leases.  *See
https://www.federalreserve.gov/bankinforeg/topics/alll.htm*

*it a trend?*  **Expenses seem to be very high in the fourth quarter and is this a trend?**

Both of these questions have the same answer, which is related to the Company's accounting change in the second quarter of 2015 related to tax credit investments.  Since inception, the Company had accounted for its tax credit investments using the cost method and had amortized that cost over its expected holding period for the investment.  This method resulted in consistent expense recognition from quarter to quarter and from year to year after giving effect to the growth in the Company's tax credit investment portfolio.  In June of 2015, the Company adopted the equity method of accounting for its historic tax credits as a preferable method of accounting for these investments.  As discussed in the Company's June 30, 2015 Form 10-Q, the cumulative effect of the change since the inception of our tax credit investments was immaterial and recognized in the second quarter.  The equity method does not utilize amortization (consistent write-off of the asset over a useful life) but rather impairment (recognized only as the investment is impaired, e.g. when it is probable that the investment balance will not be realized through future cash flow of the investment).  Under the equity method of accounting, some historic tax credit investments may not be impaired as long as they are held, while others may be written down to realizable value as impairment occurs.  This leads to uneven expense recognition from quarter to quarter as opposed to consistent amortization.

*With this background, the Company recognized no impairment with respect to its historic tax credit investments during the 3rd quarter of 2015*; in the fourth quarter, three such investments became impaired.  The impairment of $5 million, when combined with the costs associated with the State Investors Bank acquisition of $703,000, accounted for substantially all of the difference in profits between the fourth quarter and the third quarter.  Excluding impairment and acquisition costs, the Company's earnings increased $1.5 million, or 8%, from third to the fourth quarter of 2015 and $4.3 million, or 28%, from the fourth quarter of 2014.  The adoption of the equity method of accounting is expected to continue to impact the results of operations of the Company in the following manner.  First, the amount of impairment expense recognized by the Company may continue to be inconsistent from quarter to quarter.  Second, over the term of the investment, the Company expects to recognize less impairment expense than it would have recognized as amortization expense because the prior method resulted in the amortization of the entire investment.  Finally, substantially all of the impairment expense recognized by the Company is expected to continue to be associated with the structure of the tax credit investment, rather than changes in operations or economic conditions, as less than 1% of all historic tax credit investment projects are recaptured because of business

31

failure.  Because substantially all of the impairment expense has been driven by the structure of the tax credit investment, the Company plans to modify the structure of future investments so as to minimize the likelihood of impairment, except in the case of changes in operations or economic conditions.  For so long as impairment remains a meaningful expense on the Company's Statement of Income, the Company intends to continue to present non-GAAP financial information adjusting for impairment and other expenses associated with the Company's investment in tax credit entities to enable investors to better understand the results of operations of the Company.

79.    On March 16, 2016, First NBC filed with the SEC a Notification of Late Filing on Form 12b-25 regarding the filing of its Annual Report on Form 10-K for its fiscal year ended December 31, 2015.  The Company reported that it had again identified "errors" in its accounting for its Federal and State Historic Rehabilitation Tax Credit entities, and in order to evaluate the errors in accounting and internal control over financial reporting, it would need additional time to file its Annual Report, and that the financial information contained in the February 1, 2016 press release should not be relied upon:

> In connection with the preparation of its Form 10-K for the year ended December 31, 2015, the registrant identified errors in its accounting for its Federal and State Historic Rehabilitation Tax Credit entities and is evaluating the accounting for certain other matters.  As a result of the time needed by the registrant to evaluate the impact of the errors in its accounting and assessment of internal control over financial reporting, and for the registrant's auditors to evaluate the implications of the adjustments on current and historical financial statements and the registrant's internal control over financial reporting, the registrant requires additional time to complete and file its Form 10-K.

> The registrant issued a preliminary earnings release on February 1, 2016 for the quarter ended December 31, 2015.  The registrant has determined that the estimates of noninterest expense and income tax benefit contained in this preliminary release will likely be increased, and net income will likely be reduced, from the amounts reported for 2015.  The registrant is still trying to evaluate and determine the amount of the adjustments and the impact, if any, to the fourth quarter of 2015, prior quarters of 2015, or prior years.  As a result, the information contained in the preliminary earnings release should not be relied upon pending the filing of Form 10-K.

80.     On April 4, 2016, in response to First NBC's Notice of Late Filing, Nasdaq

notified the Company that it was no longer in compliance with Nasdaq Listing Rule 5250(c)(1),

and had 60 days to submit a plan to regain compliance, or else the Company's stock would be

suspended from trading and delisted from the Nasdaq Global Select Market.

81.     On April 8, 2016, First NBC filed with the SEC a Current Report on Form 8-K

confirming receipt of the Nasdaq notice, and disclosing that the consolidated financial statements

for the years ended December 31, 2011, 2012, 2013, and 2014, as well as each of the interim

periods within the years ended December 31, 2013, 2014 and 2015, needed to be restated, and

should not be relied upon:

> On April 8, 2016, the Audit Committee of the Board of Directors (the "Audit
> Committee") and management of the Company, in consultation with the
> Company's independent registered public accounting firm, Ernst & Young LLP
> ("EY"), concluded that the consolidated financial statements as of and for the
> years ended December 31, 2014, 2013, 2012 and 2011 as well as each of the
> interim periods within the years ended December 31, 2015, 2014 and 2013, need
> to be restated and should no longer be relied upon.  Similarly, related press
> releases and earnings releases, as well as management's report on the
> effectiveness of internal control over financial reporting as of December 31, 2013
> and 2014, should no longer be relied upon.
>
> The Company's management determined that the financial statements referred to
> above should be restated due to an error in the Company's methodology for the
> recognition of impairment of its investment in tax credit entities and the Company
> had not properly consolidated variable interest entities related to Low Income
> Housing Tax Credit entities.  The Company is continuing to review and quantify
> these and other potentially other less significant matters, which are expected to be
> reflected in the restated financial statements.
>
> The Company intends to file as soon as practicable restated consolidated financial
> statements as of December 31, 2014 and for the years ended December 31, 2014
> and 2013 in the Company's Annual Report on Form 10-K for the year ended
> December 31, 2015 ("2015 Form 10-K").  In addition, the Company intends to
> include in the 2015 Form 10-K (i) restated Selected Financial Data for the years
> ended December 31, 2014, 2013, 2012 and 2011 and (ii) a discussion of the effect
> of the restatement over the covered periods as a part of Management's Discussion
> and Analysis.  Based on the information regarding the years ended December 31,
> 2014, 2013, 2012 and 2011 that the Company intends to include in its 2015 Form

10-K, the Company does not intend to file an amendment to the Company's Annual Report on Form 10-K or the quarterly reports on Form 10-Q for the year ended December 31, 2014 or any prior period.

The Audit Committee and the Company's management team have discussed the matters disclosed in this Form 8-K under this Item 4.02(a) with the Company's independent registered public accounting firm, EY.

Management is continuing to assess the effect of the above matters on its conclusion on internal control over financial reporting as of December 31, 2015. The Company will report its conclusion regarding the Company's internal control over financial reporting and the effectiveness of its disclosure controls and procedures in the 2015 Form 10-K.

### *First NBC, Defendant Ryan and CFO Verdigets are sued for securities laws violations*

82.     On May 5, 2016, a securities class action complaint was filed in the United States District Court for the Eastern District of Louisiana, naming as defendants First NBC, Ryan, and Verdigets.  *Kinzler v. First NBC Bank, et. al.*, 2:16-cv-04243 (E.D. La.).

### *First NBC's credit rating is downgraded*

83.     On August 18, 2016, Kroll Bond Rating Agency ("KBRA") announced that it had downgraded the ratings of First NBC and maintained the Watch downgrade status on the Company.  KBRA reported:

NEW YORK, NY (August 18, 2016) – Kroll Bond Rating Agency (KBRA) has downgraded the senior unsecured debt, subordinated debt, and short-term debt ratings of First NBC Bank Holding Company (NASDAQ: FNBC, or "the Company") to B from BBB; B- from BBB-; and B from K3, respectively. Additionally, KBRA has downgraded the deposit and short-term deposit ratings of First NBC Bank to BB from BBB+ and B from K2, respectively.  Moreover, the Watch Downgrade status has been maintained for all ratings.  The ratings are based on KBRA's Global Bank and Bank Holding Company Rating Methodology published on February 19, 2016.

KBRA's decision to downgrade follows significant capital deterioration and concerns surrounding the ability to pay debt obligations following reported accounting errors associated with historic rehabilitation tax credit entities, as well as certain other matters, which resulted in a delayed 2015 10-K and subsequent quarterly reports.  As of the June 30, 2016 call report and FR Y-9C form, the bank and holding company level Tier 1 risk-weighted capital ratios fell to 8.15% and

6.93%, respectively.  In contrast, the first quarter average for BBB-rated bank holding companies stands at over 11% for the Tier 1 risk-based capital ratio.  Additionally, the bank and holding company level total risk-weighted capital ratios fell to 9.43% and 9.54%, respectively, rendering the Bank less than well-capitalized by regulatory standards.  Cash and deposits at the holding company summed approximately $5 million, while the annual cost of SBLF preferred and subordinated debt totaled over $6 million, raising concerns regarding the ability of FNBC to service its obligations.  In KBRA's view, the ability of the Bank to upstream dividends to the holding company could be significantly reduced given the need to rebuild bank level capital ratios.  The ratings remain on Watch Downgrade status.  Ratings could be downgraded further if final accounting adjustments are significantly larger than the figures in the 2Q16 call and FR Y-9C reports.  In addition, litigation-related expenses could materially increase, impacting future profitability and internal capital generation.

### *First NBC discloses the results of the restatement*

84.    On August 25, 2016, First NBC finally filed with the SEC its Annual Report on Form 10-K for its fiscal year ended December 31, 2015 (the "FY15 10-K"), which was signed by Defendant Ryan and CFO Verdigets.  First NBC reported net income loss of $25.2 million, and investments in tax credit entities of $108.6 million.  The FY15 10-K attached SOX certifications by Defendant Ryan and CFO Verdigets making substantially similar attestations as those in the SOX certifications attached to the 1Q13 10-Q.

85.    The FY15 10-K also included a restatement of the Company's reported financial results from fiscal years 2011, 2012, 2013 and 2014, in addition to the interim periods within fiscal years 2014, and 2015, the entirety of the Company's existence as a publicly traded company (the "2016 Restatement").

86.    First NBC, in the FY15 10-K, identifies several accounting errors that were the cause for the 2016 Restatement.  These errors included:

- Use of an inappropriate amortization method in accounting for the Company's various investments in tax credit partnerships, as opposed to proper application of the equity method of accounting.  These adjustments also include recognition of additional impairments to certain investments in Federal and State Historic Rehabilitation Tax

Credit entities based on information available at the time the related financial statements were issued;

- Consolidation of certain investments in Federal Low-Income Housing Tax Credit entities because such entities were determined to be variable interest entities in which the Company was the primary beneficiary.  The result of the consolidation was an adjustment to decrease loans, increase investments in real estate properties, and adjust the related operating results of these entities in the consolidated financial statements (including removing the impact of the erroneous historical accounting);

- Various other adjustments (*e.g.*, state tax credit timing errors); and

- Income tax effects related to the above adjustments.

87.     The FY15 10-K attributed the cause of the 2016 Restatement to, among other things, the dominant influence of Defendant Ryan over the Company's accounting and reporting matters, the lack of adequate oversight by the Board, as well as the same lack of sufficient qualified accounting personnel that was flagged as a material weakness as far back as the Draft Registration Statement filed with the SEC in November 2012:

> The Company identified a material weakness related to its control environment and risk assessment, which did not sufficiently promote internal control over financial reporting throughout the Company's management structure.  Principal contributing factors included the **dominant influence of the Chief Executive Officer over accounting and reporting matters without adequate transaction level and review controls**, to arrive at appropriate conclusions; insufficient qualified personnel, at both the executive management and staff levels, with appropriate knowledge, experience and training on accounting and reporting matters; **the lack of adequate oversight by the Company's Board of Directors** ("Board"); and the **failure of executive management to establish a tone and control consciousness** that consistently emphasizes the importance of internal control over financial reporting, risk management and segregation of duties within the Company. Impacted areas of the organization included the financial statement closing process, journal entry review and approval process, credit and receivable evaluations and the application of the allowance for loan loss methodology, identification, evaluation, and consolidation of variable interest entities and of the accounting for tax credit investments.  (Emphasis added.)

88.     The FY15 10-K also identified material weaknesses related to monitoring of

borrowers' ability to repay loans, application of the allowance for loan loss methodology, and

investments in short-term receivables:

> The Company identified a material weakness related to the monitoring of certain
> borrowers' ability to repay loans.  There were instances in which the valuation of
> collateral related to certain loans either was inaccurate or did not take into account
> supporting data available through other sources.  In addition, some loans were
> evaluated for loss in accordance with ASC 450 when they should have been
> evaluated for impairment and the creation of a specific reserve in accordance with
> ASC 310-10.  This material weakness resulted in material adjustments to the
> allowance for loan losses subsequent to December 31, 2015 after unaudited
> annual and fourth quarter financial information had been included in a Form 8-K
> filed with the Securities and Exchange Commission.

> The Company also identified a material weakness related to the evaluation and
> ongoing monitoring of the financial stability and creditworthiness of companies
> from which the Company acquired short-term receivables.  In this regard, the
> Company identified a certain short-term borrower that defaulted on a portion of
> its obligation to the Company.  As a result, the Company recognized an
> impairment of its investment in short-term receivables for the year ended
> December 31, 2015.

89.     The FY15 10-K discussed the material weaknesses relating to investments in

short-term receivables, and the impairment it recognized related to these weaknesses:

> we determined that as of December 31, 2015, we had a material weakness related
> to the evaluation and ongoing monitoring of the financial stability and
> creditworthiness of companies from which we acquired short-term receivables.
> As a result of the material weakness, we recognized $69.9 million in impairment
> with respect to our investment in short-term receivables.  We have taken or are
> taking the steps that we believe are necessary to remediate this material weakness
> by strengthening lending and credit review policies.  Moreover, we do not expect
> to enter into any material amount of investments in short-term receivables in the
> future.

90.     The FY15 10-K detailed the issues surrounding the recognition of $69.9 million

in impairment with respect to First NBC's investment in short-term receivables:

> The Company had a material investment in short-term receivables related to an
> ethanol company whose parent company has filed for bankruptcy as of the date of
> this report.  As a result of the bankruptcy event and discussions with its

regulators, the Company recorded an impairment charge of approximately $69.9 million. The balance on the receivables became delinquent and the Company recorded impairment on the outstanding balance of the receivables. The Company continues to aggressively pursue all legal remedies available against the obligor for the receivables, its parent company as guarantor, and the seller of the receivables. The Company, as of December 31, 2015, has discontinued making any future investments in short-term receivables.

91.     The FY15 10-K detailed the Company's improper accounting for investments in tax credit entities, the same improper accounting as flagged in the Draft Registration Statement in November 2012 and that was purportedly cured long ago:

The Company identified a material weakness related to the lack of a sufficient number of accounting personnel with the appropriate technical expertise and knowledge of the accounting for the Company's investments in certain of its income tax credit related entities and the related evaluation of impairment, if any, associated with these investments. This material weakness resulted in material errors in the amount of impairment recorded, which led the Company to record additional adjustments to the financial statements for all periods presented in this Annual Report on Form 10-K.

92.     The FY15 10-K also flagged the identification, evaluation, and consolidation of variable interest entities, a weakness identified in the 2Q15 10-Q and purportedly cured, as a cause for the 2016 Restatement:

The Company identified a material weakness related to the lack of accounting personnel with the technical expertise and knowledge to properly identify certain investments in real estate entities made by the Company and evaluate them under GAAP to determine if the investment qualified as a variable interest entity and whether consolidation was necessary under the applicable accounting guidance. In addition, certain investments recorded at cost should have been recorded under the equity method of accounting, which would have resulted in the recognition of additional earnings/losses and related impairment charges. This material weakness resulted in the failure to properly (i) consolidate a variable interest entity that sustained losses over all periods presented in this Annual Report on Form 10-K and that should have been included in the Company's reports of operations for such periods and (ii) record appropriate amounts of earnings/losses and impairment-related charges over those periods.

93.     The FY15 10-K noted that a lack of adequate accounting personnel also led to material misstatements in the accounting for business combinations:

The Company identified a material weakness related to the lack of accounting personnel with the knowledge of accounting for business combinations in accordance with GAAP to accurately and timely record the necessary valuation adjustments to the acquired assets, liabilities and goodwill at the time of a business combination transaction.  As a result, certain valuation adjustments were not recorded as of the date the relevant business combination was complete as required by GAAP.

94.     The FY15 10-K also attributed the 2016 Restatement to material errors in the preparation and review of journal entries:  "The Company identified a material weakness related to the preparation and review of journal entries.  The material weakness resulted from an insufficient formalized process to ensure journal entries were prepared and reviewed by the appropriate management or accounting personnel."

95.     The FY15 10-K included a report from First NBC's independent auditor, Ernst & Young, identifying material weaknesses in financial control over financial reporting in the following categories:

- Ineffective control environment and risk assessment;

- Monitoring of credit to borrowers, application of the allowance for loan loss methodology and investments in short-term receivables;

- Accounting for investment in tax credit entities;

- Accounting for business combinations; and

- Review of journal entries.

96.     The Ernst & Young report concluded that First NBC had not maintained effective internal controls over financial reporting as of December 31, 2015, based on the Committee of the Treadway Commission criteria established in its Internal Control-Integrated Framework.

*__First NBC's restated financial results for fiscal 2012__*

97.     Pursuant to the 2016 Restatement, the Company's accumulated earnings reported in its financial statements for fiscal year 2012 were restated from $59.8 million, originally

reported, to the restated amount of $50.3 million.  The 2016 Restatement, thus, revealed that the

Individual Defendants had caused First NBC to overstate accumulated earnings for 2012 by $9.5

million, or approximately 15.8%.

**_First NBC's restated financial results for fiscal 2013_**

98.     For fiscal year 2013, the Company's 2016 Restatement restated 29 line items

from its reported financial statements for fiscal year 2013.  The Company's net income was

restated from $40.9 million, originally reported, to the restated amount of $33.6 million.  The

2016 Restatement, thus, revealed that the Individual Defendants had caused First NBC to

overstate net income by $7.3 million, or approximately 17.8%.  With regard to net income, the

2016 Restatement revealed that the corrections relating to the use of the equity method and

recognition of impairment relating to the Company's investments in tax credit entities amounted

to a $4.5 million reduction of net income, and that the consolidation of certain investments and

other corrections amounted to an additional reduction of $6.5 million.  Additionally, the

Company revealed these corrections resulted in tax effects resulting in a gain of $3.7 million.

99.     The Company's accumulated earnings for 2013 were restated from $100.4

million, originally reported, to the restated amount of $83.6 million.  The 2016 Restatement,

thus, revealed that the Individual Defendants caused First NBC to overstate accumulated

earnings for 2013 by $16.8 million, or approximately 16.7%.

**_First NBC's restated financial results for fiscal 2014_**

100.    For fiscal year 2014, the Company's 2016 Restatement restated 33 line items

from its reported financial statements.  The Company's net income was restated from $55.6

million, originally reported, to the restated amount of $44.5 million.  The restatement, thus,

revealed that the Individual Defendants had caused First NBC to overstate net income for 2014 by $11.1 million, or approximately 19.9%.

101.    The Company's accumulated earnings for 2014 were restated from $155.6 million, originally reported, to the restated amount of $127.8 million.  The 2016 Restatement, thus, revealed that the Individual Defendants caused First NBC to overstate accumulated earnings for 2014 by $27.8 million, or approximately 17.9%.

102.    The 2016 Restatement also revealed that in 2014 the corrections relating to the use of the equity method and recognition of impairment relating to its investments in tax credit entities were a total reduction of net income of $11 million, and consolidation of certain investments and other corrections were an additional reduction of $5.8 million.

### *First NBC's restated financial results for its first quarter of 2014*

103.    With regard to the first quarter of 2014, the Company restated 33 line items from its reported financial statements.  The Company's net income was restated from $12.8 million, originally reported, to the restated amount of $9.6 million.  The 2016 Restatement, thus, revealed that the Individual Defendants had caused First NBC to overstate net income for its first quarter of 2014 by $3.2 million, or approximately 25.2%.

### *First NBC's restated financial results for its second quarter of 2014*

104.    With regard to the second quarter of 2014, the Company restated 32 line items from its reported financial statements.  The Company's net income was restated from $12.7 million, originally reported, to the restated amount of $9.8 million.  The 2016 Restatement, thus, revealed that the Individual Defendants had caused First NBC to overstate net income for its second quarter of 2014 by $2.9 million, or approximately 22.9%.

***First NBC's restated financial results for its third quarter of 2014***

105.     With regard to the third quarter of 2014, the Company restated 32 line items from its reported financial statements.  The Company's net income was restated from $14.4 million, originally reported, to the restated amount of $11.7 million.  The 2016 Restatement, thus, revealed that the Individual Defendants had caused First NBC to overstate net income for its third quarter of 2014 by $2.7 million, or approximately 18.5%.

***First NBC's restated financial results for its fourth quarter of 2014***

106.     With regard to the fourth quarter 2014, the Company restated 17 line items from its reported financial statements in the fourth quarter fiscal year 2014.  The Company's net income was restated from $15.7 million, originally reported, to the restated amount of $13.4 million.  The 2016 Restatement, thus, revealed that the Individual Defendants had caused First NBC to overstate net income for its fourth quarter of 2014 by $2.3 million, or approximately 14.5%.

***First NBC's restated financial results for its first quarter of 2015***

107.     With regard to the first quarter of 2015, the Company restated 31 line items from its reported financial statements.  The Company's net income was restated from $16.1 million, originally reported, to the restated amount of $10 million.  The 2016 Restatement, thus, revealed that the Individual Defendants had caused First NBC to overstate net income for its first quarter of 2015 by $6.1 million, or approximately 38.1%.

***First NBC's restated financial results for its second quarter of 2015***

108.     With regard to the second quarter of 2015, the Company restated 32 line items from its reported financial statements.  The Company's net income was restated from $17.2 million, originally reported, to the restated amount of $12.7 million.  The 2016 Restatement,

thus, revealed that the Individual Defendants had caused First NBC to overstate net income for its second quarter of 2015 by $4.5 million, or approximately 26.1%.

### *First NBC's financial results for its third quarter of 2015*

109.    With regard to the third quarter of 2015, the Company restated 31 line items from its reported financial statements.  The Company's net income was restated from $18.2 million, originally reported, to the restated amount of $11.5 million.  The 2016 Restatement, thus, revealed that the Individual Defendants had caused First NBC to overstate net income for its third quarter of 2015 by $6.7 million, or approximately 36.7%.

### *First NBC's representations regarding its accounting for investments in short-term receivables is called into question*

110.    On August 12, 2016, HoldCo Asset Management ("HoldCo"), a company that owns $8 million of First NBC subordinated debt, issued a public letter to Defendant Ryan, seeking answers to a variety of questions relating to the Company's 2016 Restatement.

111.    HoldCo identified Abengoa S.A. as the company whose receivables were deemed impaired.  HoldCo found a proof of claim filed by "The Receivables Exchange" located in New Orleans in the Chapter 11 proceeding of one Abengoa S.A.'s U.S. subsidiaries, Abengoa Bioenergy Company, LLC, and discovered that First NBC filed a notice of appearance in that subsidiary's bankruptcy.  Based upon these facts, and others discussed in HoldCo's letter to Defendant Ryan, HoldCo questioned First NBC's representation in the February 11, 2016 8-K that it believed the ethanol company and receivables seller would repay the full amount of the receivable balance, that "the parent corporation of the ethanol company is evaluating certain restructuring options that would permit a more prompt repayment of the receivable," and that First NBC management "does not expect that the company will incur any loss on its investment in short-term receivables related to the past due receivables. . . ."

***Ernst & Young determines not to continue as First NBC's independent auditor***

112.    On September 2, 2016, First NBC filed with the SEC a Current Report on Form 8-K stating that Ernst & Young had declined to stand for re-appointment as the independent auditor of the Company.

***Defendant Ryan is replaced as Chairman, but retains his role as CEO and President***

113.    On September 16, 2016, First NBC filed with the SEC a Current Report on Form 8-K disclosing that Defendant Ryan had been replaced as Chairman by Defendant Govindan, though Ryan would retain his President and CEO positions.  The Company also announced it had replaced Verdigets as CFO with Albert J. Richard, III ("Richard"), the Company's Senior Vice President and Chief Accounting Officer, though Verdigets would continue with the Company in the newly created position of Treasurer.

***First NBC's SEC filing is delayed again***

114.    On September 28, 2016, First NBC announced that it had received a notice from Nasdaq that it was not in compliance with Nasdaq Listing Rule 520(c)(1) because it had failed to file its Quarterly Reports on Form 10-Q for its first and second quarters ended March 31, 2016, and June 30, 2016, respectively.  A failure to comply would result in the Company's stock being suspended from trading, and delisted from the Nasdaq Global Select Market.

115.    On September 30, 2016, First NBC filed its Quarterly Report on Form 10-Q for its first quarter ended March 31, 2016, which was signed by Defendant Ryan and CFO Richard (the "1Q16 10-Q").  First NBC reported net income of $22.7 million, and investments in tax credit entities of $98.98 million.  The 1Q16 10-Q attached SOX certifications by Defendant Ryan and CFO Albert Richard making substantially similar attestations as those in the SOX

certifications attached to the 1Q13 10-Q.  With regard to the Company's internal controls, the

1Q16 10-Q cautioned:

> an evaluation was conducted under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act")).  Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that **the Company's disclosure controls and procedures were not effective** as of March 31, 2016 because of the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the year ended December 31, 2015.  However, based on a number of factors, including the completion of the Audit Committee's review of the underlying errors, efforts to remediate the material weaknesses in internal control over financial reporting described in the Company's 2015 Annual Report, and the performance of additional procedures by management designed to ensure the reliability of the Company's financial reporting, the Company believes that the consolidated financial statements in this Quarterly Report on Form 10-Q fairly present, in all material respects, the financial condition, results of operations and cash flows of the Company as of the dates, and for the periods, presented, in conformity with U.S. generally accepted accounting principles ("GAAP"). (Emphasis added).

> The Company is taking specific steps to remediate the material weaknesses identified by management, as described in greater detail in its Annual Report on Form 10-K for the year ended December 31, 2015.  The Company intends to complete the remediation process with respect to these material weaknesses as quickly as possible and is targeting the end of 2016 for complete implementation of the remedial measures.  The Company will test the ongoing operating effectiveness of the new controls subsequent to their implementation and consider the material weaknesses remediated only after the applicable remedial controls have operated effectively for a sufficient period of time.  Until these weaknesses are remediated, the Company plans to perform additional analyses and other procedures to ensure that its consolidated financial statements are prepared in accordance with GAAP.

### *The SEC commences an investigation of First NBC*

116.    In the 1Q16 10-Q, First NBC disclosed that the SEC had commenced an

investigation relating to the Company's financial reporting.

***First NBC is determined to be in "troubled condition" by its regulators***

117.    On October 20, 2016, First NBC filed its Quarterly Report on Form 10-Q for its

second quarter ended June 30, 2016, which was signed by Defendant Ryan and CFO Richard

(the "2Q16 10-Q").  First NBC reported net income of $3.9 million, and investments in tax credit

entities of $92.9 million.  The 2Q16 10-Q attached SOX certifications by Defendant Ryan and

CFO Richard making substantially similar attestations as those in the SOX certifications attached

to the 1Q13 10-Q.  With regard to its internal controls, the 2Q16 10-Q cautioned:

> In connection with the preparation and filing of this Quarterly Report on Form 10-Q, an evaluation was conducted under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act")).  Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective as of June 30, 2016 because of the material weaknesses in the Company's internal control over financial reporting described in the Company's Annual Report on Form 10-K for the year ended December 31, 2015.  However, based on a number of factors, including the completion of the Audit Committee's review of the underlying errors, efforts to remediate the material weaknesses in internal control over financial reporting described in the Company's 2015 Annual Report, and the performance of additional procedures by management designed to ensure the reliability of the Company's financial reporting, the Company believes that the consolidated financial statements in this Quarterly Report on Form 10-Q fairly present, in all material respects, the financial condition, results of operations and cash flows of the Company as of the dates, and for the periods, presented, in conformity with U.S. generally accepted accounting principles ("GAAP").
>
> The Company is taking specific steps to remediate the material weaknesses identified by management, as described in greater detail in its Annual Report on Form 10-K for the year ended December 31, 2015.  The Company intends to complete the remediation process with respect to these material weaknesses as quickly as possible and is targeting the end of 2016 for complete implementation of the remedial measures.  The Company will test the ongoing operating effectiveness of the new controls subsequent to their implementation and consider the material weaknesses remediated only after the applicable remedial controls have operated effectively for a sufficient period of time.  Until these weaknesses are remediated, the Company plans to perform additional analyses and other

procedures to ensure that its consolidated financial statements are prepared in accordance with GAAP.

118.   In the 2Q16 10-Q, the Company reported that it had been informed on October 11, 2016 by the FRB and the OFI that it had been deemed to be in "troubled condition" under Section 225.71 of Regulation Y, which governs, among other things, the establishment of minimum capital reserves for bank holding companies.  The "troubled condition" designation has serious ramifications for First NBC:

> This regulatory designation results in two primary limitations upon the holding company.  First, the Company will be required to seek the prior approval of the FRB before adding any new director or senior executive officer at the holding company level or changing the responsibilities of any current senior executive officer.  Second, the Company may not make indemnification or severance payments to, or enter into agreements providing for such indemnification or severance payments with, institution-affiliated parties, which include key employees and directors of the Company, without complying with certain statutory restrictions including prior approval of the FRB and FDIC.
>
> The FRB has also advised the Company that in light of its obligation to serve as a source of financial and managerial strength to the Bank, the Company should not incur indebtedness; distribute any interest, principal or other sums on subordinate debentures; declare or pay dividends on any of the Company's equity securities; redeem any corporate stock; or make any other payment representing a reduction in capital, except for the payment of normal and routine operating expenses, without prior FRB and OFI approval.

119.   On October 25, 2016, First NBC issued a press release in order to "set the record straight" regarding its struggles.  The Company claimed that "unfounded assertions in the market" were made by individuals in order "to support a short position in FNBC's stock and benefit from negative news."

### *First NBC enters into a Consent Order with its regulators*

120.   On November 17, 2016, First NBC disclosed that it entered into a Consent Order with the FDIC and the OFI.  The Company also disclosed that it had received a notice from

Nasdaq due to its delay in filing with the SEC its Quarterly Report on Form 10-Q for its third

quarter ended September 30, 2016:

> First NBC Bank (the "Bank"), a wholly owned subsidiary of First NBC Bank Holding Company (FNBC) ("First NBC"), today announced that the Bank has entered into a Consent Order with the Federal Deposit Insurance Corporation ("FDIC") and the Louisiana Office of Financial Institutions ("OFI"). The Consent Order was issued on November 10, 2016, and requires the Bank to take certain actions.

> Shivan Govindan, First NBC's Chairman of the Board, said, "First NBC is committed to addressing all the matters specified in the Consent Order and has begun the work required, all with the goal of satisfying its terms. First NBC is currently profitable and is positioned to extend our commercial customer relationships and increase share of wallet while enhancing its regulatory position."

> Under the Consent Order, the Bank has agreed, among other things, to: review the Bank's management, its loan review and problem loan identification processes, and its loan portfolio policy and procedures; formulate a strategic plan (including a plan to sustain adequate liquidity), a plan to reduce classified assets, a capital plan to meet and maintain certain minimum capital levels and a profit and budget plan; enhance internal controls; and hold additional on-balance sheet liquidity. The Bank is required to submit these plans, policies and procedures to the FDIC and Louisiana OFI for a written determination that they have no supervisory objection to them. Upon receipt of a no supervisory objection determination from the FDIC and Louisiana OFI, the Bank is required to implement and ensure adherence to the plans, policies and procedures. With respect to liquidity, in addition to the submission of a liquidity plan, the Consent Order requires the Bank to enhance its on-balance sheet liquidity on a near-term basis to achieve certain progressively higher benchmarks, including as a percentage of total deposits and total liabilities. With respect to capital, the Consent Order requires the Bank to submit a plan to achieve and maintain a Tier 1 Leverage Capital ratio equal to or greater than 10 percent of the Bank's Average Total Assets, a Tier 1 Risk-Based Capital ratio equal to or greater than 13 percent of the Bank's Total Risk-Weighted Assets, and a Total Risk-Based Capital ratio equal to or greater than 15 percent of the Bank's Total Risk Weighted Assets. The Consent Order contains deadlines by which the Bank has agreed to achieve certain deliverables. The Consent Order will continue until modified or terminated by the FDIC and the Louisiana OFI.

> Mr. Govindan continued, "Many of the matters outlined in the Consent Order were initially identified earlier this year. Since that time, First NBC has devoted significant time and resources to strengthening our business and addressing the matters raised. Our recent results demonstrate the progress we have made

executing our strategy.  First NBC is one of Louisiana's leading community banks, widely recognized for our superior customer service and positive contributions to the local economy.  We are confident that we are taking the right steps to address the matters in the Consent Order and position First NBC for long-term success."

First NBC also announced that it has received, as expected, a notification from the Nasdaq Stock Market ("Nasdaq") informing First NBC that it was not in compliance with Nasdaq Listing Rule 5250(c)(1) because it had not timely filed its Quarterly Report on Form 10-Q for the period ended September 30, 2016.  First NBC had previously announced that its quarterly report would be delayed as a result of the time needed for First NBC to complete the engagement of its new auditor and for the new auditor to complete its review of First NBC's quarterly financial statements.  The Nasdaq notification letter has no immediate impact on the listing or trading of First NBC's common stock on the Nasdaq Global Select Market.  Under Nasdaq rules, First NBC has until January 17, 2017, to submit a plan to regain compliance with its reporting obligations.  If First NBC is unable to cure the deficiency, or if it determines not to timely submit a compliance plan to Nasdaq, First NBC's common stock would be subject to delisting by Nasdaq.

## DERIVATIVE ALLEGATIONS

121.    Plaintiff brings this action derivatively in the right and for the benefit of First NBC to redress injuries suffered, and to be suffered, by First NBC and its stockholders as a direct result of the breaches of fiduciary duty by the Individual Defendants.  First NBC is named as a nominal defendant solely in a derivative capacity.

122.    This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123.    Plaintiff has not made any demand on First NBC to institute this action because such a demand would be a futile, wasteful, and useless act for all of the following, among other, reasons:

(a) The Individual Defendants are current members of First NBC's Board and control First NBC.  As such, they cannot act with independence and disinterestedness in considering a demand.

(b) As admitted in the FY15 10-K, Defendant Ryan dominates and controls First NBC.  The Individual Defendants would not take any action against Defendant Ryan because of his dominant position within the Company.  Indeed, despite Defendant Ryan's responsibility for the 2016 Restatement, the Board has allowed him to retain his lucrative positions as CEO and President of First NBC and has taken no action to recover any of the salary, bonuses, or other incentive compensation awarded to him during the time that First NBC published false and misleading financial statements.

(c) As admitted in the FY15 10-K, one of the causes of the 2016 Restatement was the Board's "lack of oversight."  Indeed, when the material weakness in internal controls over financial reporting was disclosed in the Registration Statement, it was represented that the Board would conduct an investigation to determine when and if the material weakness was cured.  However, the Board entirely abdicated its duty and allowed that evaluation to be made, as reflected in subsequent filings with the SEC, entirely by Defendant Ryan and CFO Verdigets.  Moreover, the members of the Board were frequently put on notice of misconduct, but failed to investigate and take action.  The Company was required to restate its financials before its IPO.  At the time of its IPO it had admitted material weaknesses over its internal controls.  Afterward, the Company discovered "errors" in its financials that caused it to delay making its required filings with the SEC.  Had the Individual Defendants taken timely action to investigate the Company's internal controls as required by their fiduciary, and as expressly stated in the Registration Statement that they would do, the material damage to First NBC could have been prevented or at least ameliorated.  Since it is established that the Board's failure to fulfill its fiduciary duties was the cause, at least in substantial part, of the material

damage caused to First NBC, the Individual Defendants face a substantial likelihood of liability and are not disinterested.

(d) Defendants Foley, Govindan, Toomy, and Jones were members of the Audit Committee of the Board when the events described herein occurred. Pursuant to the Audit Committee Charter, these Defendants were required to oversee legal matters that could have a significant impact on the Company's financial statements and to oversee the Company's compliance with legal or regulatory requirements. Moreover, the Individual Defendants represented in the Registration Statement that the Audit Committee, together with the full Board, would conduct an investigation to determine when and if the material weakness in the Company's internal controls over financial reporting was cured. However, as reflected in subsequent filings made with the SEC, that essential task was ignored by the Board together with its Audit Committee. The members of the Audit committee breached their fiduciary duties when they failed to perform their required role.

(e) Defendants Carrouche, French, Giorgio, Govindan, Jones, Lauricella, Merlo, and Toomy were members of the Governance Committee of the Board when the events described herein occurred. Pursuant to the Risk and Governance Charter, these Defendants were required to ensure First NBC maintained adequate internal controls and governance practices and procedures, but in violation of their fiduciary duties, these Defendants failed to perform that required role.

(f) Defendants Carrouche, French, and Giorgio were members of the Compensation Committee of the Board when the events described herein occurred. Pursuant to the Compensation Committee Charter, these Defendants were required to assist the Board in fulfilling its oversight responsibilities relating to compensation of executives and

directors, but in violation of their fiduciary duties, these Defendants failed to perform that required role.  Indeed, despite the fact that the Company was required to restate financials spanning three years, neither the Board nor the Compensation Committee has taken any action to recover the substantial salaries, bonuses and other compensation paid to its executives despite the claw back mechanisms established under SOX.

(g) Defendant Ryan is not disinterested with regard to the matters at issue in this lawsuit since he is a member of the Company's management team and has been named as a defendant in securities class action litigation for his role in the publication of false and misleading financial information and faces a material likelihood of liability therefor. Defendant Ryan cannot fairly consider the claims at issue here since his personal financial interests are at stake.

(h) First NBC has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Board members have not attempted to recover for First NBC the damages it has suffered, or will suffer thereby.  Rather, the Board has allowed Defendant Ryan to maintain his positions of power within the Company despite his culpability for the misconduct and the material damage that ensued.

(i) The magnitude and duration of the misconduct demonstrate that the Individual Defendants were aware of, or recklessly disregarded the misconduct at issue here.  All of the material weaknesses in internal controls over financial reported flagged in the November 2012 Draft Registration Statement were allowed to persist and fester until the Company was required to restate financials spanning its entire history as a public company.  The published financials were rife with false and misleading information and overstated net income by as much as 38.1%.

(j)  In order to bring this action for breach of fiduciary duties, the members of the First NBC Board would have been required to sue themselves and/or their fellow directors and officers, with whom they have entangling alliances, interests, and dependencies, which they would not do.  As such, the Defendants cannot act in a disinterested and independent manner in considering a demand.  For example:

- Defendant Merlo is a Managing Principal of Castle Creek Capital IV, LP, an asset management firm that invested approximately $27 million in First NBC in June 2011. Defendant Merlo was named as a director of First NBC as a direct result of this transaction;

- Both Defendant Lauricella and Defendant Ryan have a long-standing business relationship, having worked together for many years at First Bank & Trust Company. Defendant Lauricella served on the Board from 1994 to 2005 and Defendant Ryan served as President and CEO from 1998 to 2005;

- Defendants Aaron, Giorgio and Lauricella are well-acquainted with each other through their joint service on the Jefferson Business Council;

- Defendants Foley and Teamer are also well-acquainted, having served together as directors of Dryades Savings Bank, which was acquired by First NBC in 2010, and joined First NBC after the merger;

- Defendants Aaron and Teamer have long-standing relationships with the New Orleans Chamber of Commerce, each having served as Chairman of the Board; Aaron in 2012 and Teamer from 2008-2010;

- Defendants Ryan, Giorgio and Lauricello have a business relationship, each of them serving at Greater New Orleans, Inc.  Defendant Ryan is a member of the Executive

Committee, and Defendants Giorgio and Lauricella are members of the Board of Directors;

- Defendants Toomy and Teamer are well-acquainted through their service on the Port of New Orleans Board of Commissioners;

- Defendants Foley and Teamer are business partners in Cotton Exchange Group, LLC since 1996, which owns property leased to First NBC for the Company's branch office at 231 Carondelet Street, New Orleans, LA;

- Defendants Ryan and Giorgio are well-acquainted through their ongoing service as Board Members of the Delgado Community College Foundation; and

- Defendant Aaron is a Managing Partner of the law firm Aaron & Gianna, PLC and has forged business relationships with First NBC, and Defendants Lauricella, Ryan, Giorgio, and Teamer thereby.  First NBC is a client of the firm.  The firm's other clients have included:  First Bank & Trust, a bank with which Defendants Lauricella and Ryan were both affiliated; Jefferson Parish, the Regional Planning Commission of which included Defendant Giorgio; Jefferson Business Council, of which Defendants Aaron, Giorgio and Lauricella are members; the New Orleans Chamber of Commerce, of which Defendants Aaron and Teamer have both been Chairman of the Board; and Dryades Savings Bank, at which Defendants Foley and Teamer both served as directors;

(k) Publicly traded companies, such as First NBC, typically carry director and officer liability insurance from which First NBC could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer

that would foreclose a recovery therefrom in the event that First NBC sues to recover its damages from the Individual Defendants.

## COUNT I
## Against the Individual Defendants for Breach of Fiduciary Duties

124.    Plaintiff incorporates by reference and realleges each and every above allegation as though fully set forth herein.

125.    Plaintiff fairly and adequately represents the interests of the Company, and has not made demand on the Company's Board because such demand is futile.

126.    As alleged herein, each of the Individual Defendants had fiduciary duties to, among other things, ensure that the Company complied with all laws, rules and regulations regarding its reporting of its financial results.  When put on notice that the Company was not in compliance with those laws, rules and regulations, the Individual Defendants had the fiduciary duty to take appropriate action to correct the mistakes and prevent their recurrence.

127.    In violation of their statutory or common law fiduciary duties, the Individual Defendants ignored the obvious and pervasive problems with First NBC's internal controls over financial reporting and its corporate governance practices and procedures, and failed to make a good faith effort to correct the mistakes and prevent their recurrence.

128.    By reason of their positions as directors and/or officers of First NBC, the Individual Defendants specifically owed and owe the Company and its stockholders the highest obligations of good faith, fair dealing, loyalty, and due care.

129.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, and due care.

130.    The Individual Defendants' failures were not an exercise of reasonable business judgment.

131.    As a direct and proximate result of the Individual Defendants' failures to perform their fiduciary duties, First NBC has sustained significant financial and reputational damages.

132.    Plaintiff, on behalf of First NBC, has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff, on behalf of First NBC and its stockholders, be fully protected from the immediate and irreparable injury that the Individual Defendants' actions have inflicted, and threaten to inflict.

133.    As a result of the breaches of fiduciary duties alleged herein, the Individual Defendants are liable to First NBC for its damages.

## COUNT II
### Against the Individual Defendants for Gross Mismanagement

134.    Plaintiff incorporates by reference and realleges each and every above allegation as though fully set forth herein.

135.    Plaintiff fairly and adequately represents the interests of the Company, and has not made demand on the Company's Board because such demand is futile.

136.    The Individual Defendants had a fiduciary duty to First NBC and its stockholders to prudently supervise, manage and control the operations, business and internal controls of First NBC.

137.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of First NBC in a manner consistent with their duties.  By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of good faith, fair dealing, loyalty, and due care in the management and administration of First NBC's affairs and in the use and preservation of First NBC's assets.

138.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet caused First NBC to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to First NBC, thus breaching their fiduciary duties to the Company. As a result, the Individual Defendants grossly mismanaged First NBC and are liable to First NBC for its damages.

## COUNT III
### Against the Individual Defendants for Unjust Enrichment

139.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.    Plaintiff fairly and adequately represents the interests of the Company and has not made demand upon the Company's Board because such demand is futile.

141.    An inequity exists due to the Individual Defendants' unjust enrichment at First NBC's expense and detriment.

142.    Plaintiff, as a stockholder and representative of First NBC, seeks restitution from the Individual Defendants, and each of them, and seeks an Order of this Court disgorging all profits, salaries, benefits, and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding against the Individual Defendants and in favor of First NBC the amount of damages sustained by it as a result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement and unjust enrichment.

B.      Directing First NBC to take all necessary actions to reform and improve its corporate governance and internal control practices to comply with applicable laws, rules, regulations and best practices to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, amending First NBC's By-Laws or Articles of Incorporation and taking such other actions as may be necessary to place before stockholders a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into policies and guidelines of the Board;

C.      Awarding First NBC restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants', consultants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues that can be heard by a jury

Dated: January 19, 2017

/s/*Andrew A. Lemmon*
ANDREW A. LEMMON
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA  70057
Telephone:  985/783-6789
985/783-1333 (fax)
andrew@lemonlawfirm.com

Joseph H. Weiss
David Katz
WEISSLAW LLP
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 209-2348
*Counsel for Plaintiff*